

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00577-CV

**IN THE INTEREST OF L.M.W.**, a Child

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2021PA01534
Honorable Kimberly Burley, Judge Presiding

Opinion by:  Irene Rios, Justice

Sitting:  Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: March 6, 2023

AFFIRMED

Appellants Mother and Father appeal the trial court's order terminating their parental rights to their child, L.M.W.[1]  Mother challenges the sufficiency of the evidence supporting the trial court's finding under statutory ground (O).  Specifically, Mother argues there is insufficient evidence showing the child's removal from the parents was due to "abuse or neglect of the child[.]" *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).  Father challenges the sufficiency of the evidence supporting the trial court's finding that termination was in L.M.W.'s best interest.  We affirm.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to the parents as "Mother" and "Father" and the child as "the child" or using the pseudonym "L.M.W."  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

The Department of Family and Protective Services ("the Department") became involved in the underlying case on August 30, 2021, when the Department received a referral from hospital staff at the hospital where L.M.W. was born. The Department sought removal because it determined Mother's mental health was not being properly addressed, the parents experienced financial instability, and there were reports of domestic violence in the home where the parents were residing.

On September 1, 2021, the Department filed a petition seeking temporary managing conservatorship of the child and termination of Mother's and Father's parental rights. On July 11, 2022 and July 25, 2022, the trial court held a bench trial. The trial court heard testimony from: Kawajalen Hatton, the Department's first caseworker on this case; Irene Garza, the Department's second caseworker on this case; J.G.J, the child's foster mother[2]; Mother; and Father.

On August 23, 2022, the trial court entered an order terminating Mother's and Father's parental rights to L.M.W. Specifically, the trial court terminated Mother's and Father's parental rights based on statutory ground (O) in section 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The trial court also found it was in L.M.W.'s best interest to terminate Mother's and Father's parental rights. *See id.* § 161.001(b)(2). Mother and Father appeal.

## STATUTORY REQUIREMENTS AND STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child.

---

[2] We refer to the foster mother by her initials.

TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When reviewing the sufficiency of the evidence, we apply well-established standards of review. *See id.* §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (conducting a factual sufficiency review); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (conducting a legal sufficiency review).

"In reviewing the legal sufficiency of the evidence to support the termination of parental rights, we must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.B.*, No. 04-17-00364-CV, 2017 WL 4942855, at *2 (Tex. App.—San Antonio Nov. 1, 2017, pet. denied) (mem. op.) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a [reviewing] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

"In reviewing the factual sufficiency of the evidence to support the termination of parental rights, we 'must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.'" *J.L.B.*, 2017 WL 4942855, at *2 (quoting *J.F.C.*, 96 S.W.3d at 266). "A [reviewing court] should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. "The [reviewing] court must hold the evidence to be factually insufficient if, in light of the entire record, the disputed evidence contrary to the judgment is so significant that a reasonable factfinder could not have resolved that disputed evidence in favor of the ultimate

finding." *In re M.T.C.*, No. 04-16-00548-CV, 2017 WL 603634, at \*2 (Tex. App.—San Antonio Feb. 15, 2017, no pet.) (mem. op.).

Further, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *HealthTronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 582 (Tex. App.—Austin 2012, no pet.). This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). We, therefore, defer to the trial court's judgment regarding credibility determinations. *Coburn*, 433 S.W.3d at 823–24.

**MOTHER'S APPEAL: ABUSE OR NEGLECT UNDER STATUTORY GROUND (O)**

A trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under [c]hapter 262 for the abuse or neglect of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

Mother does not dispute that the child was in the Department's custody for at least nine months or that she failed to comply with her service plan that was made an order of the court. Instead, Mother argues the evidence is legally and factually insufficient to support a finding that the child was removed for the abuse or neglect of the child.

Subsection (O) requires proof of abuse or neglect. *See In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013) ("We agree that subsection (O) requires proof of abuse or neglect, but we disagree that those terms can never be read to include risk."). "Consistent with chapter 262's removal

standards, 'abuse or neglect of the child' necessarily includes the risks or threats of the environment in which the child is placed." *Id.* at 248. "If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been removed from the parent under [c]hapter 262 for the abuse or neglect of the child." *Id.* (internal quotation marks omitted).

"Untreated mental illness can expose a child to endangerment . . . and is a factor the court may consider." *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re J.J.H.*, No. 04-19-00597-CV, 2020 WL 690643, at *4 (Tex. App.—San Antonio Feb. 12, 2020, pet. denied) (mem. op.) (holding a parent's inadequate parenting abilities stemmed in part from the parent's untreated mental health conditions); *In re P.H.*, 544 S.W.3d 850, 858 (Tex. App.—El Paso 2017, no pet.) (holding a mother's untreated mental illness resulted in neglect of her children); *In re K.G.* 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) (holding, among other things, the trial court could have chosen to believe a parent's failure to "take steps to treat her mental health issues demonstrated an inability to provide [the child] with a safe environment"). "Similarly, domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re D.F.S.*, No. 04-20-00441-CV, 2021 WL 603364, at *5 (Tex. App.—San Antonio Feb. 17, 2021, pet. denied) (mem. op.) (internal quotation marks and alterations omitted).

Here, Irene Garza, the Department's second caseworker on this case, testified the child was removed due to concerns that Mother was not properly addressing her mental health, the parents exhibited financial instability, and domestic violence existed within the home. Garza opined this led the Department to believe L.M.W.'s health and safety were in imminent danger.

Mother admitted she has "a laundry list of medical conditions[.]" Mother and Father's service plan, which was admitted into evidence, states:

The [D]epartment is concerned about [Mother's] mental health due to her not taking any of her psychotropic medications even though she has been diagnosed with [b]ipolar [disorder], borderline disorder, and PTSD.

The [D]epartment is concerned about [Father's] and [Mother's] finances due to neither one of them currently working and [Father] donating plasma to earn money.

The [D]epartment is concerned about [Mother's] parenting skills after she was caught screaming at [the child] to shut up when [the child] was crying in the hospital.

The [D]epartment is concerned about [Father] enabling [Mother] to not take her mental and physical health serious[ly] due to him not acknowledging [Mother's] past mental health diagnoses.

. . . .

The [D]epartment is worried about [Father's] lack of acceptance of [Mother's] mental health diagnoses. His lack of acceptance puts his child['s] safety at harm due to lack of proper attention of [Mother's] mental health.

. . . .

There are concerns about [Mother's] parenting due to her yelling at [the child] in the hospital because of [the child's] crying. [Mother] is not taking her mental health diagnoses seriously which put [the child's] safety at risk. [Mother] is unable to provide for the basic needs for her child [because she does not have] stable income.

. . . .

[Mother] has not been to see a psychiatrist in over 2 years and is currently not taking medications for her type 1 and 2 bipolar, borderline disorder, seizures, or for her anxiety. [Mother] is not taking her mental health serious[ly] which is affecting her ability to take care of [the child] properly.

Mother and Father were living with paternal grandmother when the child was removed. Garza testified paternal grandmother was charged with assault for assaulting her boyfriend, who also lives in the home. According to Garza, Mother also made outcries claiming paternal grandmother and Father had committed acts of domestic violence against Mother. When being cross-examined by the attorney ad litem for the child, Garza agreed there is a history of domestic violence in the home where Mother and Father lived at the time of removal and at the time of trial.

Kawajalen Hattan, the Department's first caseworker on this case, corroborated Garza's testimony stating that Mother told Hattan "on a few occasions that [Mother] is experiencing domestic violence inside the household . . . ."

Mother acknowledged she made initial outcries of verbal abuse. Mother also admitted there is domestic violence in the home and that a household member was charged for assault against another household member. Mother further testified this is the same home that she and Father resided in when the child was removed. Mother and Garza both agreed these issues—that Mother was not properly addressing her mental health, the parents exhibited financial instability, and domestic violence existed within the home—were present at the beginning of the case and remain unresolved.

This evidence, in particular the evidence that Mother screamed at L.M.W. to "shut up" when the newborn was crying in the hospital, is sufficient to support the trial court's finding that the child was removed under chapter 262 for abuse and neglect. The trial court also could have formed a firm belief or conviction that the parents' home created a risk of abuse and neglect—necessitating the removal of the child—because there was evidence of domestic violence and verbal abuse within the home. *See E.C.R.*, 402 S.W.3d at 247–48 (holding evidence of *risk of abuse or neglect* can be sufficient to support a trial court's finding that a child was removed for abuse or neglect under statutory ground (O)). Moreover, the trial court could have formed a firm belief or conviction that the evidence showing the neglect of Mother's mental health illness posed a serious risk to the child. *See id.* To be clear, we do not hold Mother's mental health illness itself supports the trial court's finding that the child was removed due to abuse or neglect; rather, it is Mother and Father's failure to acknowledge, address, or seek treatment for Mother's mental health illness that created the risk of abuse or neglect to the child.

Furthermore, the Department's evidence in support of removal included an affidavit attached to its petition. The affidavit stated: (1) there is domestic violence in the parents' home; (2) Mother was yelling at the child to "shut up" while the child was crying in the hospital sometime after the child was born; (3) Mother has mental health conditions that she is refusing to take medicine for and Father denies that Mother has mental health conditions; (4) the child has a heart murmur that the parents were not taking seriously; (5) Father told a Department worker he was "going to take his child from this hospital no matter what"; (6) Father has previously served two-years' probation for sexual indecency with a child; and (7) the parents "refused to cooperate with the Department." "Although not evidence for all purposes, the affidavit may be considered to show what the trial court relied on to determine removal was justified." *In re A.J.W.*, No. 04-19-00346-CV, 2019 WL 6333468, at *2 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.) (citing *E.C.R.*, 402 S.W.3d at 248). In its September 1, 2021 Order for Protection of a Child in an Emergency and Notice of Hearing, the trial court found "there is an immediate danger to the physical health or safety of the child or the child has been the victim of neglect . . . on one or more occasions and that continuation in the home of [Mother] or [Father] would be contrary to the child's welfare." *See E.C.R.*, 402 S.W.3d at 248 (considering the trial court's findings in its removal order when determining whether the child was removed for abuse or neglect). The removal affidavit and the trial court's order removing the child further support the trial court's finding at trial that the child was removed under chapter 262 for the abuse or neglect of the child.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that the child was removed under chapter 262 for abuse or neglect. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also generally In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (recognizing an appellate court need not detail the

evidence if affirming a termination judgment). Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's requisite findings under statutory ground (O).

Mother's sole issue is overruled.

### FATHER'S APPEAL: BEST INTEREST

Father argues the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in L.M.W.'s best interest.

When considering the best interest of a child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in section 263.307(b) of the Texas Family Code.[3]

---

[3] These factors include:

> (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child [or] the child's parents . . . ; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills . . . ; and (13) whether an adequate social support system . . . is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

*See id.* § 263.307(b). We also consider the *Holley* factors.[4] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, we must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

*Desires of the Child, Plans for the Child, Emotional and Physical Needs, Vulnerabilities, and Stability*

"When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal

---

[4] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also E.C.R.*, 402 S.W.3d at 249 n.9.

time with a parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied). "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). "The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." *S.J.R.-Z.*, 537 S.W.3d at 693.

Here, L.M.W. was eleven months old at the time of trial, and she was taken into the Department's custody only two days after she was born. L.M.W. is placed with relatives and, according to Garza, she is "doing great[,]" she is "thriving[,]" and "has bonded with her caregivers." The placement is meeting her physical and emotional needs and the foster home is "safe and appropriate." Hatton also testified L.M.W. is "doing really well" in her current placement. According to Hatton, L.M.W. "is getting all of her needs" met and the foster parents are fully trained with CPR and first aid.

J.G.J., the child's foster mother, agreed "[the child] is doing very well" in her care. J.G.J. stated the child is thriving and "hitting all her milestones and progressing." She further testified she is able to meet all of the child's physical and emotional needs as well as her medical needs. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("The stability of the proposed home environment is an important consideration in determining whether termination is in the child's best interest."). For example, the child has "a heart murmur that is being monitored" by J.G.J. *See S.D.*, 980 S.W.2d 758, 764 (Tex. App.—San Antonio 1998, pet. denied) (holding it was in the children's best interests to place them "in a stable environment where they can receive proper care for their special needs").

In contrast, as mentioned above, Garza testified there is ongoing verbal domestic violence between Mother and Father, and Father is verbally abusive towards Mother. Garza opined, "it is not emotionally safe for the child to be raised in a home where there's ongoing emotional abuse

between the parents." The trial court heard ample testimony that Father is unemployed, continues to reside in his mother's home—the same home with a history of domestic violence between family members—and the abusive relationship between Mother and Father remains unresolved.

Garza stated there have been concerns during the parents' visitation with the child. Garza recalled one visit where Mother and Father allowed paternal grandmother to visit without prior approval from the Department. As mentioned above, paternal grandmother is one of the perpetrators of domestic violence within the parents' home. While the child did not necessarily sustain harm during this visit, Garza opined this indicates Mother and Father are not protective of the child. Mother testified that she and Father did not invite paternal grandmother to the visit, but rather paternal grandmother showed up to the visit. However, the trial court was within its right to assess the credibility of the witnesses and afford greater weight to Garza's testimony. *See HealthTronics*, 382 S.W.3d at 582.

At another visit, Garza testified Father refused to give L.M.W. a pacifier to soothe while she was crying even though she was only a few months old. Garza stated that Father "didn't think it was appropriate for a baby to have a pacifier" and believed, instead, that the child should learn how to self-soothe.

During another visit at the Department, Hattan testified that Father became verbally aggressive and raised his voice when another parent visiting their child began playing the children's jingle, "Baby Shark." Although the other parent was playing the song to her child, Father became verbally aggressive because he did not want L.M.W. to hear the song. Garza further testified that Mother and Father often discuss the case during visitation rather than spending time with the child.

The permanency goal for the child is adoption by her current foster family. J.G.J., the child's foster mother, testified she will be a long-term placement for the child and intends to adopt

the child. *See In re A.M.M.*, 04-19-00806-CV, 2020 WL 2139308, at *4 (Tex. App.—San Antonio May 6, 2020, pet. denied) (mem. op.) (indicating evidence the child is "thriving in the current placement" in a "stable and nurturing environment with a planned adoption" supported the trial court's best-interest determination). Finally, Garza opined Father is not able to care for the child and believes termination of Father's parental rights is in the best interest of the child so that she can be adopted by her foster parents. *See S.J.R.-Z.*, 537 S.W.3d at 693 (holding a child's "young age[] render[s] [her] vulnerable if left in the custody of a parent who is unable or unwilling to protect [her] or attend to [her] needs").

These factors weigh in favor of termination.

*Emotional and Physical Danger and History of Abuse*

A factor the trial court weighs when determining the best interest of a child is "whether there is a history of abusive or assaultive conduct by the child's family or those who have access to the child's home[.]" TEX. FAM. CODE ANN. § 263.307(b)(7). "[E]ndangering conduct is not limited to actions directed towards the child." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *D.M.*, 452 S.W.3d at 471.

As mentioned in the abuse and neglect section above, Father's verbal abuse against Mother remains unresolved. Hatton witnessed the abuse firsthand after a visitation when Father was "in [Mother's] face, yelling and screaming at her" at a bus stop. According to Hatton, bystanders intervened to calm the situation.

Moreover, Father continues to live in a home that has a history of domestic violence. Father admitted in his testimony "there is domestic violence in [his] relationship with [Mother,]" he has verbally abused Mother, and this is an inappropriate environment for a baby. As mentioned below, Father has not successfully completed anger management or addressed the Department's concern

regarding Father's abusive conduct. Garza agreed that "all of the concerns that [were] present at the beginning of the case, and the domestic violence incidents that occurred during the case, are still present . . . ."

These factors weigh in favor of termination.

*Programs, Acts and Omissions, and Willingness to Effect Positive Change*

Father's service plan, which was admitted into evidence, required Father to participate and complete a domestic violence program, an anger management program, parenting classes, and a psychological evaluation. Father's plan also required he maintain safe and stable housing and maintain stable employment.

Garza testified Father completed the psychological evaluation and parenting classes but has not completed the anger management program or domestic violence program. It is undisputed that Father still lives in a home with a history of domestic violence.

Hatton testified Father has not been consistently employed throughout the case and Father admitted he was fired from his most recent job in May 2022. Garza stated she has "not received any proof that [Father] has been looking for employment." When asked why Father has not been able to find work since he left his job in May 2022, Father responded: "Employment has been hard for the locations that I have tried." However, Father admitted he has "not gone to Texas Workforce too often" and has not "gone to [a] temp agency" to find work. When pressed on why he hasn't gone to Texas Workforce often, Father replied: "It's dull to sit there in front of the computer sometimes." Father then claimed he went to Texas Workforce every week for the past three weeks and asserted he submitted ten to fifteen applications every time he went. However, as the factfinder, it was within the trial court's purview to determine the credibility of Father's testimony and weigh the evidence against Garza's and Hatton's testimony. *See Coburn*, 433 S.W.3d at 823–24.

Father claimed he has not completed services on his service plan because of a delay caused by the transfer of the case from the first caseworker to the second caseworker. However, Father admitted he was referred to the anger management program by the first caseworker at the beginning of the case. Father testified he did not participate in the program and asserted: "it was not the kind of class I was looking for, and I asked for a different service." Father conceded the first caseworker referred him to a new provider after he was unsuccessfully discharged from the first anger management program. Father claimed he did not start the second anger management program because he was unable to contact the new provider. Garza disputed Father's testimony, claiming it was Father who was failing to answer the provider's phone calls. Garza testified she verified the phone number the provider had on file for Father after the provider told Garza that it was unable to contact Father. Garza stated:

> [The provider] continu[ed] to try to call him, and they were not successful.
>
> I had to get on a three-way call at some point, when I knew [Father] was going to be in the office and he was going to be able to answer my question. So I called him at the same time, so he could answer the call for them.

Father admitted he has not made much progress on his services. Garza concluded all the concerns that were present at the beginning of the case were still present at the time of trial, Father has not shown he is able to properly take care of L.M.W., and it would be in the best interest of the child for Father's parental rights to be terminated.

This evidence tends to show that Father is unwilling to: (1) avail himself of the programs available to promote the best interest of the child; (2) seek out, accept, and complete counseling services and to cooperate with and facilitate the Department's close supervision; and (3) to effect positive environmental and personal changes within a reasonable period of time. *Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE ANN. § 263.307(b)(10), (11).

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in L.M.W.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also generally A.B.*, 437 S.W.3d at 503 (recognizing an appellate court need not detail the evidence if affirming a termination judgment). Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding.

## CONCLUSION

The trial court's order terminating Mother's and Father's parental rights to L.M.W. is affirmed.

Irene Rios, Justice